AMERICAN SUGAR REFINING Co. v. UNITED STATES (No. 7).[1]

1. POLARISCOPE TEST OF SUGAR—FORCE OF TREASURY REGULATIONS.

The Treasury Department having promulgated detailed and comprehensive regulations respecting the use of the polariscope in testing sugar on importation, these regulations are to be taken not as instructions or orders to be followed at discretion, but on the contrary have the force of law, are uniform in their operation, general in application to all importations of sugar, binding alike on importers and on the officials of the Treasury.

2. INVALID CONTRACT.

By a familiar rule where one party to an alleged agreement has concealed from the other facts it was the duty of the first party in fairness to disclose, the contract so entered into is not a valid one.

United States Court of Customs Appeals, February 1, 1911.

TRANSFERRED from United States Circuit Court for Southern District of New York (T. D. 30130).

[Reversed.]

H. B. Closson for appellant.

D. Frank Lloyd, Assistant Attorney General (Charles Duane Baker on the brief), for the United States.

Before MONTGOMERY, HUNT, SMITH, BARBER, and DE VRIES, Judges.

BARBER, Judge, delivered the opinion of the court:

The appellants made the following importations of sugar at the port of New York, upon which duty should be assessed under the provisions of the tariff act of 1897: By the ship *Strathdon*, March 20, 1898, 23,700 packages; by the *Arecuna*, September 20, 1898, 8,847 packages, and by the *Asphodel*, January 23, 1899, 101,626 packages.

At the time of these importations paragraph 209 of said tariff act provided that such sugars should be tested by the polariscope and that

---

[1] Reported in T. D. 31273 (20 Treas. Dec., 222).

the results of such polariscopic tests should determine the classification of the sugars upon which duty at the rates provided in the act should be assessed.

At the same time there were in force regulations, promulgated by the Secretary of the Treasury on the 27th day of October, 1897, under the authority of section 251 of Revised Statutes, which contained detailed provisions for the application of the polariscopic test to such sugars. It is unnecessary to recite these regulations at length. They may be found at page 974 et seq. of the Treasury Decisions for the year 1897, and are in T. D. 18508. Amongst other things, they provide that suitable samples shall be taken of each importation designed to fairly represent the same; that at least two tests shall be made of each sample, and that the test to be accepted for classifying the sugars shall be the average of such tests or of such tests and additional tests, if made, as the regulations provide. It is prescribed that all tests under the regulations shall be made by Government employees, and, further, that the importers shall be immediately notified by messenger, when practicable, of the results of the tests first made to determine the classification, and that he shall have two official days in which to claim error in the reported tests and to ask for a resampling and retesting, for which provisions are also made.

Detailed provisions are made in the regulations for the location, equipment, and maintenance of laboratories in which sugars are to be tested and minute instructions given for the making of these polariscopic tests. The regulations in terms provide that they shall apply to all sugars imported under the provisions of the act of 1897.

It is also expressly stated—

That these regulations shall take the place of all orders or regulations heretofore issued with reference to the sampling and classification of imported sugars and molasses.

Samples of each importation were taken and the tests made pursuant to the regulations. Portions of some or all of these cargoes were resampled or retested, but it is unnecessary to consider the details thereof. These tests gave results which were unsatisfactory to the customs officials, and instead of using the official tests as the basis of classifying these sugars the collector classified all the same upon what is known as the settlement tests.

From the record before us, as well as information obtained from the opinions in the cases hereinafter referred to in which an adjudication of some of the issues raised by the appellants' protests has already been made, we learn that the polariscope is an instrument so adjusted that when a ray of polarized light passes through a tube filled with a certain solution of sugar the scale indicates the percentage of pure sugar; that under the commercial system of testing sugars which had been in use prior to the passage of the act of 1897 the actual readings

of the scale on the eyepiece of the polariscope were taken as showing the actual value of the sugar; that is, the result of the polariscopic test was determined by the readings of the eye. This commercial method was in use between buyers and sellers of sugars, each party employing experts to test the sugars, and in case their tests disagreed a compromise of the same was arrived at by averaging the results of the polariscopic tests made by the representatives of the respective parties or by making a third test. This method was known as the settlement test, and the words "settlement test" will be hereinafter used in that sense.

The method prescribed in the Treasury regulations before referred to varies from the settlement test in the main by prescribing that certain changes or reductions in the readings of the polariscope must be made to correct erroneous results which follow from the polariscopic tests of sugars taken at differing temperatures, it being established that the same sugars when tested at different temperatures by the polariscope show different results. The courts in the cases involving these protests hereinafter referred to appear to have been satisfied that the methods adopted by the Government result is more accurate determination of the amount of pure sugar in each sample tested than the "settlement test."

The appellants seasonably filed their protests against the classifications and assessments so made, in each protest alleging in substance, amongst other things, that under the law the Secretary of the Treasury had no authority to insist upon the tests provided for by the general regulations referred to as a test of sugars, but that the only lawful test was the usual commercial polariscopic test recognized and accepted in trade by buyer and seller as ascertained by methods and instruments used by chemists engaged in the business of testing sugars, being methods in general use by sugar chemists, manufacturers, and refiners at the time of the existing tariff act, and claiming that the tests and returns were erroneous and excessive owing to erroneous and incorrect methods of testing the sugars by the polariscope as prescribed by the regulations of the Secretary of the Treasury.

Upon this phase of the protests appeal was taken by the appellants here from the judgment of the Board of General Appraisers overruling the same to the Circuit Court and then by the United States to the Circuit Court of Appeals, in which last-mentioned court the judgment of the board was affirmed. A petition to the Supreme Court for a writ of certiorari in the case was later denied.

The issue which was determined in this litigation appears to have been as stated by the Circuit Court of Appeals—

Whether Congress used the words "testing by the polariscope" and "shown by the polariscopic test" with some special trade meaning which would confine them to a particular method of conducting such test.

The court held that the words were not so used and that all the matters of detail relating to the polariscopic tests came naturally within the province of the Secretary of the Treasury under the general power given him to make regulations not inconsistent with law under section 25 1of the Revised Statutes, and concluded by saying that—

It seems a reasonable conclusion that Congress when it passed the act of 1897 containing merely the phrase "testing by the polariscope" without any further directions as to such test, without approval or condemnation of either of the variant methods of conducting it which the Treasury Department had theretofore prescribed for imported as well as domestic sugars intended to leave all details as to selection of instruments, employment of experts and instruction as to the method, to the sound discretion of the Secretary.

And for the purposes of this case we conclude that such decision is an adjudication that the regulations in question are a proper exercise of the powers conferred by statute upon the Secretary of the Treasury.

Reference for the history of this litigation is here made to Bartram Bros. *v.* United States (123 Fed. Rep., 327); United States *v.* Bartram Bros. (131 Fed. Rep., 833); McCahan Sugar Refining Co. *v.* Steamship Wildcroft, etc. (195 U. S., 635), and American Sugar Refining Co. *v.* United States (211 U. S., 155).

The case before this court is upon further claims embodied in the original protests and not considered in previous litigation.

For convenience we insert here the protest in the case of the *Arecuna*, which is typical of the protests upon this phase of the case with reference to the three shipments:

That the tests upon which said sugar is classified are not the tests of the samples or the resamples taken by the appraisers, and are not the tests contemplated by the law or directed by the regulations of the Treasury Department.

The same considerations apply to the three protests, and they are disposed of in the same manner except as may be hereinafter stated with reference to the importation upon the *Strathdon*, concerning which it is claimed by the Government there was a valid and express agreement on the part of the appellants that the settlement tests should be used as the basis of classifying the same.

The appellants contend that the official Treasury Regulations of 1897, which prescribe the methods to be adopted in making polariscopic tests have the force of statutory law and that the collector was bound to obey the same; that, therefore, the classification of the sugars upon the settlement tests was illegal and that the Treasury Department was without authority so far as this case is concerned to authorize the collector by special instructions embodied in the department's letter under date of November 3, 1898, hereinafter referred to, to classify the sugars upon any basis other than the official tests which were made pursuant to the regulations.

The counsel for the Government concedes that a regulation of an executive department when authorized by law has the force of a statutory enactment, but contends that the said regulations of the Treasury Department are not of that character, but that they are, rather, rules and directions to the subordinate officials of that department designed as a guide not only to collectors but other officers in testing and classifying sugars, and are not, on the whole, of a character that prevents the Secretary from varying or disregarding them in any particular case or in this case. The Government further contends that upon the record it appears that the appellants are gainers from the adoption of the settlement tests, because it claims a less amount of duty on the whole of these importations was paid than would have been paid had the official tests been accepted as the basis of classifying these sugars.

For convenience in discussion, we dispose of the second claim first by saying that we do not understand that the facts relating thereto are as claimed by the Government. There is no evidence which tends to support the same except a statement in a letter from the assistant appraiser to his superior under date of March 31, 1899, relating wholly to the importation of the *Asphodel.* In this letter he states that in his opinion the appellants were the gainers by the adoption of the settlement tests as a basis of classification to the amount of over $2,000 as as far as that cargo was concerned. We do not think this statement is competent evidence of the fact, and, in addition, are unable to understand how in view of the contents of the letter he could himself come to that conclusion. Whether we are right in this understanding or not is immaterial, because there is nothing in the record from which it may be claimed that the duty exacted was not greater on the other cargoes than it would have been had the official tests been taken as the basis of their classifications.

The only express authority shown for the collector to classify these sugars upon the basis of the settlement tests may be found in a letter from the Assistant Secretary of the Treasury under date of November 3, 1898, in which this language is used:

In the case of the importations ex *Arecuna*, referred to, the so-called settlement tests should be returned by you on the invoices as the tests of the importations covered thereby, and that when such importers refuse to comply with your request for such settlement tests you should exercise the authority conferred upon you by the provisions of paragraph 16 of the act of June 10, 1890.

The record in places refers to the fact that special instructions presumably of like tenor were given by the Treasury Department with reference to the other importations, but they were not produced in evidence.

The paragraph of the act of June 10, 1890, referred to in the above letter, provides in substance that the appraisers and collectors may cite any importer to appear before them and to testify under oath as to

any matter or thing deemed material respecting any imported merchandise for the purpose of ascertaining the dutiable value or classification thereof, and that such appraisers or·collectors in such proceeding may require the production of any letters, accounts, or invoices relating to said merchandise, and from the record we understand it was contemplated by the Treasury Department to invoke the provisions of this section, if necessary, for the purpose of compelling the importers to produce, amongst other things, their settlement tests, and that the same were furnished by the importers by reason thereof.

The record appears to disclose that the examiner having the *Arecuna* importation in charge thought the original tests were not fairly representative of the shipment. Just why he came to that conclusion the record does not state, but we assume that it resulted from discrepancies in the official tests or from the fact that the results of such tests and the settlement tests were considerably at variance.

As we have seen, under the commercial system which had been in use for 20 years before the passage of the act of 1897 the actual readings of the scale on the eyepiece of the polariscope were taken as showing the actual value of the sugar—that is, the test was one made by the readings of the eye. In the case of a disagreement in the tests between the parties interested a settlement was reached either by other tests or by equalization of those already made.

Under the later Treasury method the test is not absolutely determined by the eye, but the regulations provide that the readings must be corrected in the manner there provided, and, as we understand, these changes or corrections were directed to be made because of the fact that the same sugars when tested at different temperatures showed different results.

We are, therefore, brought to the consideration of the real question in issue, which is: Are the Treasury regulations referred to such general regulations made by the Secretary of the Treasury under the authority of law as to have the force of law? As before stated, the adjudication already had in this case goes no further than to say that such regulations are warranted by law. It is material, therefore, to consider in a general way, a little further than has already been done, their scope and effect. They relate to all sugars imported under the tariff act of 1897 and dutiable thereunder, and consequently relate to all importers of such sugars. Although they are directed to the customs officials, they were published in the authorized Treasury Department publications, thereby becoming matters of public knowledge, and, we think, of such character that importers were bound to take notice thereof. They prescribe precisely and with great detail how imported sugars shall be tested. No provisions are found therein for the acceptance of any other than the official tests for the purpose of classifying sugars. At least two, and in certain cases more than

that number, of separate tests of the sugars are provided for, all to be made by the Government's experts; and the regulations further provide, if upon notice of the results of the tests the importer claims error therein and seasonably requests a resampling of the sugars, such resampling and retesting thereof may be granted, provided that "on evidence furnished such claim shall appear to the appraiser to be well founded."

Upon the subject of classification these regulations contain over 30 separately enumerated paragraphs, and conclude with the one already cited, to the effect that the regulations shall take the place of all orders and regulations heretofore issued with reference to the sampling and classification of sugars.

What would be the natural inference of any person of intelligence upon reading these regulations? Would it be that the tests therein prescribed were to govern in all cases or that they should be adopted only if and whenever the results thereof were satisfactory to the department itself? Do they contain fair notice to the reader that at the option of the department the result of its own tests may be disregarded and other tests substituted therefor as the basis of classification and the resulting assessment of duties? Of course, if by a fair interpretation they may be held to be rules designed only for the guidance of collectors and other officers, and of such a character that the Treasury Department may at any time abrogate or change the same, they may be disregarded, as was done in this case.

We think upon a careful examination of these regulations that it must be held that they are general as applying to all sugars and general as applying to all importers, and that they convey fair notice to the importers that all sugars subject to duty will be classified as a result of the tests made by the experts in the collector's office appointed for the purpose, and that no tests for classification will be accepted by the department other than such official tests.

We do not think after the tests had been made by the department and the classification made as a result thereof that an importer could be heard to claim that other and private tests should be used in classifying the sugars. The converse should be true, and he should have a right to understand that the sugars would be classified as the result of the official tests and not otherwise.

We are strengthened in this conclusion because of the fact that the regulations so fully provide for mistakes and accidents in the testing of the sugars, and show in no uncertain language that the classification for duty must be made upon the result of the official tests either the original or the original and resampling tests, as the case may be. In the case of a resampling it is provided that the appraiser may classify the sugars upon the test either of the original or the resample as seems to him most just. We can not escape the conclusion that

these regulations in name are regulations in fact and not merely instructions or orders.

It was held by the Court of Claims in the case of Landram *v.* United States (16 C. Cls. Rpts., 74, 86) that—

A distinction between "instructions" and "regulation" is inherent in the nature of the two things and that an instruction is a direction to govern the conduct of a particular officer to whom it is addressed and that a regulation affects a class of officers.

Applying that definition here, it seems that the regulations of the Secretary of the Treasury in question are clearly general regulations in that they affect classes of persons—namely, importers of sugars and officers whose duty it is to classify the same—and that they also affect a class of importations—namely, sugars.

It is to be observed that there is no evidence upon the record tending to show any fraud or misrepresentations with reference to these importations upon the part of the appellants. The samples for testing were taken by the Government as provided in the regulations, and no claim of fraud is made in this court.

We think, on the whole, that these regulations for the classification of sugars, which, as we have already seen, have been adjudicated as a proper exercise of the authority of the Treasury, are general regulations having the force of law, and must govern the classification of the sugars involved in this case, and that it was not competent for the Secretary of the Treasury to vary the same, as was attempted by the special directions contained in the letter of November 3, 1898.

The record is entirely silent as to when, where, by whom, under what circumstances, or with what degree of accuracy these settlement tests were made; but it is reasonable to presume that they were made either at the port of exportation or of importation during the time, whatever it was, and as to that the record does not show, covered by the transaction of sale and purchase and that they were made by the agents of the appellants and their vendors.

The contention of the Government that its prescribed tests are more accurate than the settlement tests, which was upheld in the other branch of this case, and the fact that so much care has been taken in prescribing these regulations for the testing of sugars, to the end that accurate results shall be obtained, all lead to the conclusion that in this case the official tests more nearly represent the true quality of the sugars for classification purposes than the settlement tests; but whether this be so or not we see no reason for holding that, at their option alone, the officers connected with the collection of the customs duties shall be permitted to go contrary to the general regulations they have themselves prescribed. To hold otherwise, we think, would have a tendency to produce great confusion and uncertainty in the classification of sugars, because, if not limited to its own tests, the Government may accept or compel the acceptance of any private tests,

settlement or otherwise. If it is found that the prescribed regulations are not adequate to protect either the Government or the importers, it would seem that the same power still resides in the Secretary of the Treasury to make general regulations for the protection of both that was vested in him when the regulations in question were promulgated.

As to the *Strathdon* importation, it appears that the examiner at the port of New York was dissatisfied with the results of the official polariscopic tests thereof, and so reported to his superiors; that thereupon and on the 28th day of October, 1898, the supervising examiner sent to the appellants a notice in effect that a resample and retest of the *Strathdon* cargo had been made which showed a much higher grade of sugar than any test the Government had in fact made.

We are not clear whether or not a resampling test had been made, but are clear that if it had been made the results thereof were not correctly stated in such notice.

An authorized representative of the appellants then had a conference with the examiner having this matter in charge. At the examiner's request the settlement test of the shipment was then given to him, and thereupon he said:

I guess I will classify this sugar on this settlement test; if you are satisfied, we will be satisfied.

The representative of the appellants replied:

Yes, rather than take the tests just sent to me;

referring to the alleged resample test.

And it is upon this agreement that the Government relies in support of its claim that the *Strathdon* importation was lawfully classified upon the basis of the settlement test.

It is apparent that the representative of the appellants at the time was given to understand that the alleged resample tests had in fact been made; that they showed a much higher grade of sugars than the original tests made by the Government, and that the examiner was disposed to insist upon the same as a basis of grading the sugars unless the settlements tests were agreed to. It is also apparent that the examiner then knew, or ought to have known, either that the resample tests had not been made of the *Strathdon* cargo or that the results thereof had not been correctly reported to the appellants.

We think, under these circumstances, the representative of the Government was either making misrepresentations relating to a material fact or was concealing something which was known to him, and which was not known to the other party, and which it was his duty at the time to impart to the representative of the appellants. It follows that an agreement so obtained can not and ought not to be enforced. The principles of law applicable to such a state of facts

are too familiar to require discussion or citation of authorities. One will not be permitted to take advantage of an agreement so obtained.

We note this conclusion is reached upon the evidence of the appellants' representative, and that, although no reason appears why he could not have been called as a witness, the examiner who procured this agreement did not testify.

It may be further observed that in due course the appellants protested, as already appears, to the classification of the sugars of this importation upon the basis of the settlement tests.

The Government does not claim that any agreement of similar import as to the cargoes of the *Arecuna* or the *Asphodel* was in fact made, except it urges that the court should presume the existence of an agreement, as to these two cargoes, like the one relating to the *Strathdon*. Our conclusion as to the *Strathdon* case, however, disposes of any such claim as to the cargoes of the *Arecuna* and the *Asphodel*.

We hold that the sugars in all these importations should be classified for duty upon the basis of the official polariscopic tests already made; that reliquidation should be made accordingly, and therefore the judgment of the circuit court and the board is *reversed*.