KREUTZ & CO. *v.* UNITED STATES (No. 3492)[1]

---

[1] T. D. 45752.

United States Court of Customs and Patent Appeals, May 23, 1932

*James N. Bevans* for appellant.

*Charles D. Lawrence*, Assistant Attorney General (*William H. Futrell* and *Ralph Folks*, special attorneys, of counsel), for the United States.

[Oral argument April 3, 1932, by Mr. Bevans and Mr. Folks]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

LENROOT, Judge, delivered the opinion of the court:

Appellant, in 1926, made a consumption entry of 14 bags of ergot of rye at the port of New York. Of these, 7 bags were found unfit for use by the Department of Agriculture, acting under the provisions of section 11 of the food and drugs act of 1906, 34 Stat. 768, 21 U. S. C. A., sections 1–15, and consequently an order resulted for their destruction or exportation. It appears to be established that these 7 bags of rejected merchandise were in fact exported but not under customs supervision.

After the condemnation of said merchandise the collector liquidated the entry and assessed duty upon the importation at the rate of 10 cents per pound under paragraph 37 of the Tariff Act of 1922. Within the proper time following liquidation, appellant filed a protest against the action of the collector. As the importer made the usual cash deposit at the time of entry, which was applied by the collector to the payment of the duties so assessed, the object of the protest is to recover the amount of duties paid upon the 7 bags of condemned merchandise.

The report of the collector contains the following:

The entry under protest covers 14 bags of ergot. It appears from the official reports, herewith, that seven bags thereof were condemned by the Department of Agriculture under the pure food act and were reported as exported under date of June 5, 1926.

As these 7 bags were not exported under customs supervision, duty was assessed at 10 cents per pound under paragraph 37, act of 1922.

The protest was received within the statutory time.

The answer of the appraiser to the protest was offered in evidence by appellant and received without objection. It reads as follows:

The merchandise is described on the invoice as ergot of rye and consists of an importation of 14 bags of ergot advisorily classified for duty by this office at 10 cents per pound under the provision for such merchandise in paragraph 37 of the tariff act on a sample submitted from the wharf where the merchandise was passed.

The importer claims that the entire merchandise was rejected as a prohibited importation inasmuch as it did not comply with the regulations of the food and drugs act. Upon consultation with the Department of Agriculture this office was

advised that seven bags marked HFML #101–7 were exported to Japan on June 5, 1926. The remaining seven bags marked ERML #71–77 were released by that office on July 22, 1926. A letter from Mr. H. C. Stuart, assistant collector, addressed to Department of Agriculture, makes mention of the fact that the seven bags exported were not exported under customs supervision. However, the records of the Department of Agriculture in this instance show that they had accepted the exportation as a regular one and had waived the formality required.

Upon the trial in the United States Customs Court, the protest was overruled and, upon rehearing granted upon motion, this action was affirmed. A subsequent motion for rehearing was denied, Judge Young dissenting. From the judgment overruling the protest of appellant this appeal is taken.

Paragraph 37 of said tariff act, under which the merchandise in question was classified and assessed, reads as follows:

PAR. 37. Ergot, 10 cents per pound.

Section 2 of said food and drugs act, so far as pertinent to the questions here involved, reads as follows:

The introduction into any State or Territory or the District of Columbia from any other State or Territory or the District of Columbia, *or from any foreign country*, or shipment to any foreign country of any article of food or drugs which is adulterated or misbranded, within the meaning of sections 1 to 15, inclusive, of this title, is prohibited; * * *. (Italics ours.)

Section 11 of said act reads as follows:

EXAMINATION OF SAMPLES OF IMPORTS; REFUSAL OF ADMISSION AND DELIVERY TO CONSIGNEE; DELIVERY TO CONSIGNEE PENDING EXAMINATION AND DECISION ON BOND; CHARGES FOR STORAGE AND LIEN THEREFOR.—The Secretary of the Treasury shall deliver to the Secretary of Agriculture, upon his request from time to time, samples of foods and drugs which are being imported into the United States or offered for import, giving notice thereof to the owner or consignee, who may appear before the Secretary of Agriculture, and have the right to introduce testimony, and if it appear from the examination of such samples that any article of food or drug offered to be imported into the United States is adulterated or misbranded within the meaning of sections 1 to 15, inclusive, of this title, *or is otherwise dangerous to the health of the people of the United States*, or forbidden to be sold or restricted in sale in the country in which it is made or from which it is exported, or is otherwise falsely labeled in any respect, the said article *shall be refused admission*, and the Secretary of the Treasury shall refuse delivery to the consignee and shall cause the destruction of any goods refused delivery which shall not be exported by the consignee within three months from the date of notice of such refusal under such regulations as the Secretary of the Treasury may prescribe. The Secretary of the Treasury may, however, deliver to the consignee such goods pending examination and decision in the matter on execution of a penal bond for the amount of the full invoice value of such goods, together with the duty thereon, and on such refusal to return such goods for any cause to the custody of the Secretary of the Treasury, when demanded, for the purpose of excluding them from the country, or for any other purpose, said consignee shall forfeit the full amount of the bond. All charges for storage, cartage, and labor on goods which are refused admission or delivery shall be paid by the owner or consignee, and in default of such payment shall constitute a lien against any future importation made by such owner or consignee. (Italics ours.)

Article 490 of the Customs Regulations of 1923 reads as follows:

ART. 490. *Delivery under bond.*—Merchandise subject to examination by representatives of the Department of Agriculture in accordance with the provisions of the food and drugs act and the insecticide act shall not be delivered to the consignee prior to report of examination unless a bond has been given (Customs Form 7551 or 7553) in an amount equal to the invoice value of the goods, together with the duty thereon.

There is no direct evidence in the record that the bond provided for in said section 11 of the food and drugs act was ever given. However, it may perhaps be inferred from the report of the collector and answer of the appraiser, together with the presumed compliance with article 490, Customs Regulations of 1923, that such bond was given, and that the condemned merchandise was actually exported, but not under customs supervision; and for the purposes of this case, in view of our conclusion, we will assume that the bond provided for as above stated was given, and that the merchandise was released to the appellant after the giving of such bond.

The first question is whether the importation into the United States of the merchandise here in question was prohibited by law. The Government contends that, because paragraph 37 of the Tariff Act of 1922 provides for an import duty upon ergot, and the merchandise here in question being ergot, it was not specifically prohibited from importation. We can not agree with this conclusion. Section 2 of the food and drugs act, hereinbefore quoted, specifically provides that the introduction into any State or Territory or the District of Columbia from any foreign country of any article of food or drugs which is adulterated or misbranded is prohibited. Section 11 of the same act, hereinbefore quoted, provides that—

* * * and if it appear from the examination of such samples that any article of food or drug offered to be imported into the United States is adulterated or misbranded within the meaning of sections 1 to 15, inclusive, of this title, or is otherwise dangerous to the health of the people of the United States, * * * the said article shall be refused admission, * * *.

Therefore, it is clear that the importation of adulterated or misbranded ergot, and ergot otherwise dangerous to the health of the people of the United States, is prohibited by law quite as effectually as if said paragraph 37 of the tariff act had read—

Ergot, 10 cents per pound, provided that the importation of adulterated or misbranded ergot, and ergot otherwise dangerous to the health of the people of the United States, is prohibited.

This seems so plain that further discussion of this point is unnecessary, because it is conceded that the merchandise in question was rejected under the provisions of the said food and drugs act as unfit for use.

The next question for determination is whether duties may be lawfully assessed upon articles the importation of which is prohibited

by law. This question very early in the history of our country was answered in the negative in the case of *McLean* v. *United States*, 6 Peters 404, wherein Justice Story, delivering the opinion of the court, said:

\* \* \* In point of law, no duties, as such, can legally accrue upon the importation of prohibited goods; they are not entitled to entry at the customhouse, or to be bonded. They are *ipso facto* forfeited, by the mere act of importation. *The Good Friends*, then, having arrived in April, 1812, long before the double duties were laid, and her cargo being prohibited from importation, it is impossible, in a legal sense, to sustain the argument that the importation could be deemed innocent, and the Government could be entitled to duties, as upon a lawful importation. It was entitled to the whole property, by way of forfeiture; and to nothing by way of duties.

We can not find that the rule declared in the language above quoted has ever been modified in any way by the Supreme Court.

We are therefore of the opinion that, inasmuch as it appears that the condemned merchandise here in question never actually entered into the commerce of the United States, but was actually exported, though not under customs supervision, it was not subject to duty because its importation was prohibited and duties could not be lawfully assessed thereon. Whether, if the merchandise in question had actually entered into commerce and been sold in the United States, appellant would have been entitled to have the duties refunded we need not here determine.

Said section 11 of the food and drugs act clearly does not contemplate the payment of any duty, as such, upon condemned merchandise; on the contrary, its sole purpose is to exclude such goods from the commerce of the country. The bond required is a penal one, and the section prescribes that the amount of the penalty shall be the invoice value of the merchandise, plus the duty which would have been assessed thereon if its importation had not been prohibited. The reference in the section to invoice value and duties is simply for the purpose of determining the amount of the penalty.

We hold that, the importation of the merchandise here in question being prohibited by law, and the merchandise having actually been exported to a foreign country, such merchandise was not assessable with duty under the Tariff Act of 1922, and the protest of appellant should be sustained. This conclusion does not in any way jeopardize the legitimate interests of the Government. Assuming, as we have, that a penal bond was taken by the Government, as the law and regulations provide, the Government, upon failure of appellant to export the merchandise under customs supervision, could have brought suit upon the bond and presumably could have recovered the penalty therein provided.

It is clear to us that Congress, by providing that the amount of the duties assessable if the merchandise was importable should be

included in the penal bond, did not intend that, where the merchandise was not importable, the penal amount of the bond should be recoverable and, in addition thereto, duties upon the merchandise; and it is equally clear that Congress never intended that the penalty named in the bond might be waived by customs officials and that, in lieu thereof, the much smaller penalty of a sum equal to the duties might be imposed.

In the case at bar, it was the mandatory duty of the Government officials, under said section 11 of the food and drugs act, to collect the amount named in the bond, and we can not impliedly approve of a proceeding whereby the importer may escape such penalty by merely paying a sum equal to the duties that would have been assessable had the merchandise been importable, under which proceeding prohibited merchandise might thus be permitted to enter the commerce of the country.

The judgment of the lower court is *reversed* and the cause is *remanded* with instructions to *sustain* the protest of appellant.

DISSENTING OPINION

GRAHAM, Presiding Judge: I am unable to agree with the opinion of the majority in this case. The question which arises here is one of very serious import to the customs service. As I view it, it is, in brief, whether the importer of impure or dangerous drugs or foods may evade the laws which have been provided for the protection of our people and may be permitted to substitute his own methods of attempted compliance therewith.

The appellant imported ergot, a well-known abortifacient drug. The collector estimated duties upon it from a sample taken at the wharf. The goods had been duly imported. *United States v. Field & Co.*, 14 Ct. Cust. Appls. 406, T. D. 42052; *Cunard S. S. Co. v. Mellon*, 262 U. S. 100. They were not goods which could not, primarily, enter the commerce of the country, but were dutiable under paragraph 37 of the Tariff Act of 1922. They were, at least, only conditionally subject to exclusion from the commerce of the country.

Presumably, under section 11 of the food and drugs act, 34 Stat. 772, quoted in the majority opinion, the Secretary of Agriculture requested samples of this importation to be sent to him. Samples seem to have been sent and the entire shipment of 14 bags was released to the consignee by the collector. I think it a fair presumption to indulge in that a penal bond was then taken by the collector as provided by said section 11. If so, it was under this provision in said section—

The Secretary of the Treasury may deliver to the consignee such goods pending examination and decision in the matter on execution of a penal bond for the amount of the full invoice value of such goods, *together with the duty thereon.*

The section further proceeds—

And on refusal to return such goods for any cause to the custody of the Secretary of the Treasury, when demanded, for the purpose of excluding them from the country, or for any other purpose, said consignee shall forfeit *the full amount of the bond.* (Italics are mine.)

If the bond must be for the penal sum of invoice value and duty, then the amount of duty must be ascertained by the only officer, under the law, who can do so, namely, the collector. That is all he has done here, and it is against his ascertainment of such duty that the importer now protests.

If, as is held by the majority, the remedy of the Government is by suit upon the bond only, then no damages may be ascertained and adjudged by any court until the amount of duty is ascertained; not the initial estimate by the collector, but the formal liquidation and classification.

But the most serious fault I find with the decision of the majority is the conclusion that the importer may establish an exportation of a part of this ergot in some other way than the law provides.

Said section 11 provides that if the Secretary of Agriculture shall find any such foods or drugs to be impure or dangerous, etc.—

the Secretary of the Treasury shall refuse delivery to the consignee and shall cause the *destruction* of any goods refused delivery *which shall not be exported* by the consignee within three months from the date of notice of such refusal *under such regulations as the Secretary of the Treasury may prescribe.* (Again I have italicized.)

The Secretary of the Treasury has made and promulgated such regulations, which have, as has been often held, the effect of law, if reasonable. *Gump* v. *United States,* 3 Ct. Cust. Appls. 137, T. D. 32384; *Penick & Ford* v. *United States,* 12 Ct. Cust. Appls. 432, T. D. 40611; *Gallagher & Ascher* v. *United States,* 14 Ct. Cust. Appls. 38, T. D. 41548; *United States* v. *Bird,* 16 Ct. Cust. Appls. 306, T. D. 42876. No intimation is made here that the said regulations are not reasonable. Such regulations, applicable to the port of entry here, are articles 492 to 502, inclusive, of the Customs Regulations of 1923, promulgated May 27, 1924.

These regulations provide that when samples are required by the Department of Agriculture the request therefor shall be attached to the invoice. Thereupon the collector or appraiser shall notify the importer and the goods are to be held intact until the Department of Agriculture has completed its examination. If the goods fail to comply with the requirements they must be returned to the collector for disposition. Article 494 has this significant provision:

Liquidation of all entries of goods directed to be held pending examination will be suspended until it shall be ascertained whether or not delivery is refused under the law.

Entries covering goods which are exported or destroyed under these regulations will be liquidated free of duty as a "nonimportation," and the estimated duties will be refunded as an excess of deposits.

The following provisions provide for notice to the importer that the goods must be exported or destroyed within three months, and give detailed instructions as to the methods to be followed by both the importer and the customs officials. Reports to the chief of station are provided for after all formalities have been complied with.

After the examination in this case was made by the Department of Agriculture, the importer was, presumably, notified to redeliver the seven bags of ergot to the collector and failed to do so and to comply with said Treasury Regulations. The liquidation, which had been suspended under said regulations, was then made. The entry could not be reliquidated "free of duty as a 'nonimportation',," for the reason that the said regulations had not been complied with in the destruction or exportation of the goods. There was but one thing which the collector could do, if these regulations are to be considered as valid, namely, to liquidate the entry as if the goods were dutiable. He did so, and it is against this liquidation that the instant protest is made. If the goods had been destroyed or exported, "under such regulations as the Secretary of the Treasury may prescribe," to quote the language of said section 11, the amount of estimated duties would have been, under said article 494, "refunded as an excess of deposits."

What has been substituted for compliance with these regulations? A report of the appraiser of the port stating that his office was advised by the Department of Agriculture that seven bags of the ergot had been exported and that the Department of Agriculture had "waived the formality required." On what theory could the Department of Agriculture do this? It was an act *ultra vires* and did not affect the legal status of the importation.

In addition, a letter from an assistant collector of the port, addressed to the importers, six months after the goods were supposed to have been exported, replying to a letter of the importer which is said to have inclosed certain documents showing that the goods were exported, and in which the assistant collector attempts to waive the requirements of the regulations, is relied upon. Upon what theory could this be done by an assistant collector, or even by the collector himself? The law confers the right to make these regulations upon the Secretary of the Treasury, and the collector had no right to waive them. *Bradley Martin, Jr.* v. *United States*, 3 Ct. Cust. Appls. 384, T. D. 32982; *Kronfeld, Saunders & Co.* v. *United States*, 4 Ct. Cust. Appls. 60, T. D. 33308; *Schelling* v. *United States*, 14 Ct. Cust. Appls. 159, T. D. 41691; *United States* v. *Bird, supra; United States*

v. *Ingram & Co.*, 17 C. C. P. A. (Customs) 228, T. D. 43668; *Rosen-field* v. *United States*, 18 C. C. P. A. (Customs) 146, T. D. 44361.

My conclusion is that unless goods of this character are destroyed or exported as provided by the regulations of the Secretary of the Treasury, they are, in law, not destroyed or exported at all, but are supposed to have entered into the commerce of the country. In many cases, I dare say, this will not only be theoretically, but actually, true. Ergot, narcotics, impure foods, come into the country and are released to the importers under bond. Unless they are destroyed or exported as the law requires, if special methods are allowed in special cases, a certain amount of this dangerous material will inevitably filter into the commerce of the country and the safeguards of the law be nullified.

I am of opinion the judgment of the United States Customs Court should be *affirmed*.