JOSEPH E. SEAGRAM & SONS, INC. *v.* UNITED STATES (No. 4391)[1]

[1] C. A. D. 227.

United States Court of Customs and Patent Appeals, February 1, 1943

*White & Case (Thomas Kiernan* and *Alfred D. Van Buren* of counsel) for appellant.
*Paul P. Rao,* Assistant Attorney General (*Joseph F. Donohue,* special attorney, of counsel), for the United States.

[Oral argument December 1, 1942, by Mr. Kiernan and Mr. Rao]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

JACKSON, Judge, delivered the opinion of the court:

Appellant brought suit in the United States Customs Court to recover a sum of money alleged to have been unlawfully 'exacted by the Collector of Customs of the port of Indianapolis, Ind., in assessing and collecting customs duty on ten shipments of whisky imported from Canada to the subport of Lawrenceburg, Ind.

The trial was held in Indianapolis and judgment was entered against appellant by the Third Division of the said court. From that judgment this appeal was taken.

It appears that the shipments involved herein were entered at Lawrenceburg at various times between February and June, 1938. The collector liquidated the entries under authority of article 815, Customs Regulations, 1937, and Customs Information Exchange 526/35—9/19/34. The merchandise was assessed with duty at the rate of $2.50 per proof gallon, under the provisions of paragraph 802

of the Tariff Act of 1930 as amended by the trade agreement effective January 1, 1936, between the United States and Canada (T. D. 48033), upon the amount of whisky imported as shown by a gauge made by customs gaugers at Lawrenceburg.

Appellant protested the action of the collector, alleging among other reasons that—

There was no accurate gauge or measure made by the Customs Gauger of the whiskey imported, as required by Article 1371 to 1374 of C. R. 1937, or as set out in Chapters I to V of the Customs Gauging Manual.

Because of the failure of the gauger to comply with these regulations, there is no basis for determination of gallons imported other than the invoice showing quantity shipped from Canada.

Therefore, the determination of wine gallons imported should be made by deducting 2½% normal outage from the invoiced quantity, and duty computed on this basis.

The amount of duty per gallon assessed is not here involved. The determining issue before us, in view of our conclusion, is whether or not the record discloses a gauge of the merchandise in conformity with Customs Regulations, articles 1371 to 1374.

Eleven witnesses testified for appellant, two of whom were official gaugers in the customs service at Lawrenceburg who gauged the involved whisky. There was no testimony offered on behalf of the Government.

The record shows the whisky to have been the product of Canada, manufactured by Distillers Corporation, Ltd., at Villa Le Salle, Province of Quebec. It is called in the record "St. Pierre whiskey." The distillers were in possession of approximately 250,000 imperial gallons of whisky in barrels and kegs none of which were entirely filled. The amount of the St. Pierre whisky here involved was contained in 213 barrels.

Before the importations were made appellant addressed a telegram dated May 17, 1937, to the Commissioner of Customs in Washington, D. C., stating that it desired to import whisky in packages not filled to capacity and requesting information as to whether packages so filled could be imported and if duty would be determined on the actual quantity as stated in the invoice accompanying the bill of sale and entry gauge. The Commissioner of Customs, answering that telegram on May 19, 1937, stated that there was no objection to importing whisky in casks or barrels not filled to capacity and if the customs gauger found specifications to be correct that duty and revenue tax, in the absence of any allowance under paragraph 813 of the Tariff Act of 1930, would be based on the actual quantity shipped, under article 817 of the Customs Regulations and T. D. 27379.

The first shipment of the whisky was received at Lawrenceburg sometime in September, 1937. It consisted of 87 barrels. This shipment is not involved here.

All of the imported St. Pierre whisky was placed in the bonded United States Customs warehouse of appellant in Lawrenceburg.

The first shipment of whisky was gauged as to quantity by what is known as the "weight method," facilities for which were in the warehouse. Gauging by the weight method comprises weighing of the barrel with its contents for gross weight, then draining the contents from the barrel and weighing the empty barrel for tare. The difference between the gross weight and the tare determined the weight of the contents, which by a conventional table was converted into gallons.

Shortly after that shipment had been gauged by the weight method as aforesaid, the inspector of customs at the subport of Lawrenceburg, a witness herein, received instructions from the collector's office to regauge it by the so-called "rod method." The barrels were regauged according to the said witness as follows:

The net weight on the original gauge was converted into the nearest half-gallon, and that was used as the contents of the barrel. Then by the method of the small outage rod the outage of the barrel was computed and added to the contents to make the capacity.

Apparently there was no material difference in gallonage between the results of the two gauges. The witness, when asked the reason for instructions to regauge the whisky, stated that "it seems that it was important to determine the outage, and under the weight method it was impossible to determine the outage on an individual barrel." He testified that he had been advised by the collector's office that all subsequent entries of the St. Pierre whisky were to be gauged. by the rod method rather than by the weight method for the same reasons that he was instructed to regauge the first shipment.

Apparently there are but two methods employed in the customs service in gauging the contents of barrels of whisky. One is the weight method hereinbefore described, and the other is the rod method.

The instruments used in quantity gauging by the rod method are the calipers, bung rod, barrel rod, scale, and wantage or outage rods. Pursuant to article 1373 of the Customs Regulations of 1937 the gauging instruments are to be tested as often as may be necessary and kept in conformity with the United States standard.

The said inspector described the procedure of gauging a barrel of whisky by the rod method as follows:

* * *. As I said, the contents, or the capacity of the barrel is determined by three measurements, the length taken by the caliper, the bung diameter, which is taken by the bung diameter rod, and the head diameter, which is taken by the head diameter rod. The method we use is to take the length first and chalk it on the barrel. Underneath the length we put the bung diameter, which is the larger of the two diameters. Underneath the bung diameter we note the head diameter, and subtract the head diameter from the bung diameter to get the difference. They have divided barrels into three varieties for purposes of gauging

them. The first variety is the type of barrel whose stave is almost straight, full length.

Q. That is known as the conoid variety?—A. Yes, the third type of barrel is one with the most curvature in the stave, and between the two is a more or less average barrel that they call the second variety, and of course the more curvature in the stave the more capacity the barrel has, and for all purposes we used the second variety barrel when we judged the barrels to be second variety barrels. To arrive at the mean diameter from the head and bung diameter, we took the differences of the two diameters and multiplied by sixty-four one-hundredths, which is the multiplier for the second variety barrel, and the result of that multiplication we added to the smaller diameter, which is the head diameter, which gave us the mean diameter. Then on our sliding scale, by the standard method of computation by the use of the scale, with the use of the length of the barrel and the mean diameter, we determine the capacity of the barrel. These barrels, having quite a lot of outage, we used a small outage rod to determine the outage. On our gauge sheets we entered the capacity and the outage which was subtracted from the capacity, which gave us our net contents.

That procedure is in substantial conformity with the one outlined in the Gauging Manual published by the Bureau of Customs in 1935 for the use of inspectors of customs in gauging liquids imported in casks, barrels, etc. The Gauging Manual is an exhibit in the case.

The record shows that the barrels involved herein and their contents, pursuant to the instructions given the inspector that they should be gauged by the rod method, were gauged in the following manner. The said inspector testified that, when the gauge was started, he gauged 15 or 20 barrels in accordance with the rod method. He checked the results of the rod method with the figures of net weight which were marked on those barrels and, finding that they agreed, converted said net weight to gallons and added thereto 1 gallon. Then he used the outage rod and found the outage (which is the vacuity or vacant space between the surface of the contents and the bung), and added the outage to the contents to give the capacity of the barrel. The witness said that that method was the result of experimentation, and that it was found to be an accurate way of ascertaining barrel capacity. Where the net weights were not legible on the barrels herein, the rod method as described by him in the quotation from his testimony was used in the gauge. Those barrels, the witness stated, would average one or two to a car. All of the other involved barrels except those that were gauged by the rod method were gauged by taking the net weights as they appeared on the barrels and determining the outage with the outage rod.

Another witness, also an inspector of customs assigned to Lawrenceburg as a storekeeper and gauger, stated that he had gauged certain of the barrels of the involved whisky, testified "We used the outage rod on all barrels," and in answer to the following questions gave the following answers:

Q. Did you use any of these other rods, Gunther's sliding scale, the calipers, or the bung diameter rods?—A. We used them on certain individual barrels on

which the net weight was obliterated, and we used them as a control to check net weights on the barrels that were legible.

Q. Aside from that, you did not use them?—A. That is right.

Q. In how many barrels out of an entry would you say you used them?—A. That would be indefinite to say.

Q. Would it be a safe amount to say that a majority of the barrels were gauged by means of taking the net weight from the head of the barrel, convert that into capacity, and determining vacuity by means of the outage rod?—A. Yes, sir.

Q. That would be by far the greatest majority of them?—A. Yes, it would be.

It is not necessary to discuss the evidence given by any of the other witnesses for the reason that none of them were competent to relate what actually was done by the gaugers except that they stated the outage rod was used.

The quantity of the involved merchandise as found by the gaugers was greater than that specified by the invoices. The whisky was withdrawn from the warehouse from time to time between the months of March and June, 1938, and duties paid thereon by appellant based on the quantity contained in each package as shown by the report of the gaugers. Thereafter the entries were liquidated on the basis of the capacity of each package less 2½ per centum for outage in accordance with T. D. 27379, which provides that "If it appears, however, that the invoice does not correctly state the quantity shipped, the invoice quantity should be ignored and the capacity of the containers taken as the basis from which the allowance should be made."

The trial court held that the gaugers acted in accordance with the law and regulations in determining the quantity of merchandise imported and that—

* * * Since there was no gauge made by the importer it has not been established that the invoiced and entered gauge actually represented the quantity imported. Even were the plaintiff to establish that the gauge made by the customs gaugers was inaccurate and improper, the plaintiff is not entitled to relief because it has not affirmatively been shown that the quantity imported was as invoiced and entered rather than as returned by the customs gaugers. It is well settled in customs jurisprudence that the burden is upon the importer not only to establish that the Government is in error, but also to affirmatively establish the correctness of his claim.

Under paragraph 815 of the Tariff Act of 1930, the Secretary of the Treasury is both authorized and directed to make rules and regulations necessary for the enforcement of the provisions of schedule 8, pertaining to the importation of spirits, wines, and other beverages.

Pursuant to such statutory authority, regulations were made and promulgated by the Secretary of the Treasury, Customs Regulations, 1937, pp. 766–769, articles 1371 to 1378 inclusive. In defining the duties of the inspector or officer exercising the functions of a gauger, article 1371 provides that "They will themselves actually do

the gauging and report the result." Paragraphs (*b*) and (*f*) of that article read as follows:

(*b*) When gauged by the rod method, each package of wines, spirits, and liquors must be gauged and inspected separately without regard to marks and brands already on such package.

(*f*) Where practicable, packages of wines, spirits, and liquors may be gauged by the weight method when the packages are marked (by scoring (cutting) or dyeing in the wood) with the gross and net weights and the tare, and the collector of customs shall be satisfied that the liquors were gauged prior to exportation and the weights and tare marked on the packages under the supervision of the proper officials of the government of the country of exportation. Each package shall be weighed for verification of the marked gross weight, and if a material difference is found between the marked gross weight and the actual gross weight the capacity of the cask or package shall be ascertained by the rod method. A test shall be made of at least one in five packages for verification of the marked tare by dumping the contents and weighing the empty cask or package. If the test shows the marked tare to be inaccurate each package in the shipment shall be gauged separately by the weight or the rod method.

While all of the conditions precedent were seemingly present so as to make the gauging of the involved merchandise practicable by the weight method and ample facilities were present in the warehouse to gauge by such process, the gauger was instructed by the collector under the discretion given in the quoted paragraph (*f*) to use the rod method in gauging the involved merchandise.

It is clear that the whisky was not gauged by the rod method as prescribed by the regulations for the reason that the record conclusively shows that each package was not gauged "without regard to marks or brands already on such package."

The amount of whisky imported must be ascertained in order to levy duty. There is no way of ascertaining the amount of whisky imported in barrels except by gauging. The Secretary of the Treasury set out in article 1371 the methods by which whisky content must be gauged. The importer obviously had an interest in full compliance with the regulation. In our opinion such methods are mandatory upon the gaugers. Since the gaugers did not follow the weight method or the rod method prescribed in article 1371 it must necessarily follow that there was no legal gauging or measurement of any kind of the involved merchandise by the customs officials. *Penick & Ford (Ltd., Inc.)* v. *United States*, 12 Ct. Cust. Appls. 432, 438, T. D. 40611. Therefore the presumption of correctness attaching to the action of the collector is overcome and the only basis upon which the amount of whisky imported can possibly be calculated is the amount contained in the invoices.

The only gauging of imported whisky for customs purposes permissible under the laws of the United States, so far as we have been able to ascertain, is that done by Government gaugers. Article 1371 hereinbefore mentioned provides that the gaugers will themselves

actually do the gauging and report the result. If, as in this case, the gauging was null and void, the situation is that in effect no gauge was made by the Government officials. Since no gauge was made by the Government officials we do not think that it was incumbent upon the importer to establish his case by any evidence other than that contained in his invoices.

We are mindful of the oft-repeated rule in customs litigation that it is necessary for the importer to prove not only the classification made by the collector to be in error, but that he must also establish affirmatively the correctness of his contention. *United States* v. *H. V. Albrecht, Albrecht Import Co., Inc., and Stanley Jordan & Co.,* 27 C. C. P. A. (Customs) 112, C. A. D. 71; *United States* v. *Marcel Kurtz,* 21 C. C. P. A. (Customs) 12, T. D. 46320; *Benrus Watch Co., and Pomerance Co. (Inc.)* v. *United States,* 21 C. C. P. A. (Customs) 139, T. D. 46467.

It has been held many times in reappraisement proceedings that when the customs officials have failed to designate and examine under section 499 less than 1 package out of every 10 of the imported merchandise, with certain well-known exceptions, the appraisement is null and void and the entered value of the merchandise is the proper basis upon which to assess duty. *United States* v. *V. W. Davis, Sinai Kosher Sausage Factory,* 20 C. C. P. A. (Customs) 305, T. D. 46087, and cases cited therein; *C. J. Tower & Sons* v. *United States,* 21 C. C. P. A. (Customs) 417, T. D. 46943, 71 F. (2d) 438; *United States* v. *Boston Paper Board Co.,* 23 C. C. P. A. (Customs) 372, T. D. 48233.

It is clear that the issue here involves neither classification nor appraisement. It merely concerns quantity. It is more analogous to appraisement proceedings than to proceedings in classification. In reappraisement proceedings the appraisement made by the appraiser may be null and void. In the present case, since the gaugers failed in their mandatory duty under article 1371 in gauging the amount of imported merchandise the gauging was null and void.

There is nothing in the record impeaching or discrediting the invoices. Presumably the only reason that the collector made the assessment upon capacity was because the gaugers' returns showed larger quantities than those shown in the invoices, but inasmuch as the gaugers' returns were void for the reasons hereinbefore stated there was nothing before the collector challenging the invoices. Therefore, in our opinion, the proper quantity of whisky upon which duty should be levied must be that quantity contained in the invoices.

This court has held that under certain circumstances the invoice may be considered to be some evidence. *United States* v. *Bloomingdale Bros. & Co.,* 10 Ct. Cust. Appls. 149, T. D. 38400; *United States* v. *Sabin,* 12 Ct. Cust. Appls. 520, T. D. 40731; *Union Food Products*

*Co.* v. *United States,* 13 Ct. Cust. Appls. 343, T. D. 41253. In the instant case the invoices are the only evidence of the quantity of whisky imported. In the case of *United States* v. *International Clearance Co.,* 12 Ct. Cust. Appls. 430, T. D. 40592, this court held that since the weight of cattle there involved was not ascertained by customs officials upon arrival the duty was properly assessable on the weight of the cattle as shown by the invoice.

Since the action of the customs officials in purporting to gauge the involved merchandise is null and void for the reasons hereinbefore stated and since official gaugers appear to be the only persons who may legally make a gauge of whisky for customs purposes, it necessarily follows that based on the evidence of the invoices the imported whisky is properly assessable for duty upon the amounts set out therein.

In view of our conclusion it is not necessary to consider the other questions involved in this appeal.

For the reasons herein stated the judgment of the United States Customs Court is *reversed,* and the cause *remanded* for further proceedings in conformity with the views herein expressed.

### PETITION FOR REHEARING DENIED APRIL 2, 1943

PER CURIAM: The United States has petitioned for a rehearing, and in its petition sets out some statements which in our opinion cannot be passed over without some comment by this court.

There is nothing in the decision in this case warranting the statement in the petition that "Some of the barrels were held by the court to have been properly gauged." A reading negatives any such interpretation of the decision. Moreover, there is no evidence in the record fixing any definite number of barrels that were gauged by the so-called "rod method."

The petition asserts "that the legal effect of the decision in this case is to make the invoice *prima facie* evidence of all the facts which it contains in every case." Then appears the sentence: "True, the decision does not directly so hold." It passes our understanding how any such inference can be drawn from our decision. Those familiar with customs law and practice know, or should know full well, that the invoice is not *prima facie* evidence of all the facts which it contains in every case. While it should not be necessary so to state, nevertheless we deem it proper to mention that under certain circumstances it has been judicially held by this court that the invoice is some evidence. The presumption of correctness attaching to the collector's action having been overcome without consideration of the invoice as evidence against the presumption, said invoice was the only evidence before us as to the quantity of liquor imported.

The petition for rehearing is *denied.*