(C. D. 1007)

PROUVOST LEFEBVRE OF RHODE ISLAND, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided May 29, 1946)

*Joseph F. Lockett* for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Richard E. FitzGibbon*, special attorney), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges

COLE, Judge: Plaintiff, an importer of wool and manufacturer of wool tops, entered at the port of Boston, 688 bales of greasy Australian wool, which was classified under paragraph 1102 (b) of the

Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1101, par. 1102 (b)), as wool in the grease, not specially provided for, and assessed with duty, on the basis of clean content, at the rate of 34 cents per pound.

The collector's classification and assessment of duty are accepted, the percentage of clean content, upon which the rate of duty was applied, furnishing the sole basis for dispute. In alleging an erroneous finding of clean content, plaintiff attacks the Customs Regulations of 1943 (part 13, sections 13.11 to 13.16, inclusive), issued pursuant to statutory authority, paragraph 1104 of the Tariff Act of 1930, which "authorized and directed" the Secretary of the Treasury "to prescribe methods and regulations for carrying out the provisions * * * relating to the duties on wool and hair."

The customs regulations, *supra*, outline an elaborate procedure for determining the percentage of clean content of imported wool, providing a method for selecting proper samples and allowing a series of tests under certain conditions. The sections of the customs regulations referred to bear titles as follows: section 13.11, "Definitions"; section 13.12, "Invoices"; section 13.13, "Entry; affidavit of clean content; duties; sampling by importer"; section 13.14, "Weighing, sampling, and laboratory testing for clean content"; section 13.15, "Examination for clean content by nonlaboratory method"; section 13.16, "Grades of wool, standards, reconsideration of."

Sections 13.14 and 13.15, *supra*, because of their pertinency to the present issues, are set forth in full. They are as follows:

**13.14 Weighing, sampling, and laboratory testing for clean content.**—(*a*) When used in this section, the terms:

(1) *Sampling unit* means all the similar packages covered by one entry or withdrawal containing wool or hair of the same kind or same general condition and character, produced in the same country, packed in substantially the same manner, and entered as or found to be subject to the same rate of duty.

(2) *General sample* means the composite of the individual portions of wool or hair drawn from a sampling unit.

(*b*) The following shall be weighed, sampled, and *tested* for clean content, as prescribed in this section, unless such sampling or *testing* is not feasible: (1) all importations of wool or hair classifiable under the provisions of paragraph 1102, Tariff Act of 1930, except importations entered directly for manipulation under the provisions of section 562, Tariff Act of 1930, as amended, or for manufacture under the provisions of section 311, Tariff Act of 1930; (2) all imported wool or hair manipulated under the provisions of such section 562 and classifiable after manipulation under the provisions of such paragraph 1102; and (3) such other imported wool or hair as the collector may designate. When a quantity of any wool or hair so *tested* which is less than the sampling unit previously *tested* is to be withdrawn by a transferee as provided for in section 557 (b), Tariff Act of 1930, as amended, or is to be exported from continuous customs custody without manipulation or manufacture, there shall be a new determination in accordance with these regulations of the percentage clean content of such quantity with an appro-

priate adjustment or new determination, as may be required, of the part of the original sampling unit remaining in customs custody.

(c) A general sample shall be taken from each sampling unit, unless it is not feasible to obtain a representative general sample of the wool or hair in a sampling unit or to *test* such a sample in accordance with the provisions of this section, in which case the clean content of the wool or hair in such sampling unit shall be estimated as provided for in section 13.15. At the request of the importer of record, the owner, or the transferee, as the case may be, two general samples may be taken from a sampling unit if the taking and *testing* of a second general sample is feasible. If two general samples are taken, one general sample shall be held for use in making a second *test* to determine the clean content of the wool or hair if such a *test* is requested in accordance with the provisions of paragraph (e) of this section, or if a second *test* is found desirable by the appraiser or the chief chemist.

(d) The clean content of all general samples taken in accordance with this section shall be determined by *test* in a customs laboratory, unless it is found that it is not feasible to *test* such a sample and obtain a proper finding of percentage clean content. A report of the percentage clean content of each general sample as established by the *test* or a statement of the reason for not *testing* a general sample shall be forwarded to the appraiser. If the report is not received by the appraiser within 1 month after the date of entry, the clean content of the wool or hair shall be estimated as provided for in section 13.15 except that in the case of wool or hair received under an entry for immediate transportation, an estimate of clean content, as provided for in section 13.15 shall be made if the laboratory report of clean content is not received by the appraiser within 1 month from the date on which the last of the merchandise is received. However, the appraiser may withhold his finding of clean content until the laboratory report is received and predicate his finding on that report if so requested in writing by the importer of record, the owner, or the transferee, as the case may be. An estimate of clean content shall be made pursuant to the provisions of this paragraph only when an adequate quantity of the wool or hair is available for examination.

(e) The appraiser shall promptly notify the importer of record, the owner, or the transferee, as the case may be, by mail of the percentage clean content found by him. If such person is dissatisfied with the appraiser's finding, he may file with the appraiser a written request in duplicate for another laboratory *test* for percentage clean content. Such request shall be filed within 14 calendar days after the date of mailing of the notice of the appraiser's finding of clean content and shall be supported by an affidavit in duplicate on customs Form 6449 when such an affidavit has not been filed previously. The request shall be granted if it appears to the appraiser to be made in good faith and if a second general sample, as provided for in paragraph (c) of this section is available for testing, or if all packages, or, in the opinion of the Bureau, an adequate number of the packages, represented by the general sample are available and in their original imported condition. The second *test* shall be made upon the second general sample, if such a sample is available. If the second general sample is not available, the packages shall be reweighed, resampled, and *tested* in accordance with the provisions of this section. All costs and expenses of such operations, exclusive of the compensation of customs officers, shall be borne by the person who requested the further *test*. Such person may be present during such resampling and *testing*. If he is dissatisfied with the results of the second laboratory *test*, or if a second laboratory *test* is not feasible, the wool or hair may be retested subject to the conditions and in the manner provided for in section 13.15 (c).

**13.15 Examination for clean content by nonlaboratory method.**—(*a*) Importations of wool or hair classifiable under the provisions of paragraph 1101 or 1102, Tariff Act of 1930, as amended, including all imported wool or hair withdrawn for consumption after being manipulated under the provisions of section 562, Tariff Act of 1930, as amended, and classifiable under the provisions of paragraph 1101, as amended, or paragraph 1103 after such manipulation, when not *tested* under the provisions of section 13.14, shall be examined by the appropriate customs officer, who shall estimate and report the percentage clean content of each lot.

(*b*) The appraiser shall promptly notify the importer of record, the owner, or the transferee, as the case may be, by mail of the percentage clean content estimated by the appropriate customs officer. If such person is dissatisfied with the estimate and, within the time and under the conditions prescribed in section 13.14 (*e*), files a request for a new *examination* of the wool or hair and a reestimation of its percentage clean content, such request shall be granted, provided the request appears to the appraiser to be made in good faith. The aforementioned importer, owner, or transferee shall be given an opportunity to inspect those of the packages which are in dispute.

(*c*) If the person who requested reestimation of the percentage clean content is dissatisfied with such reestimation, he may, within 14 calendar days after the date of mailing of the notice of the appraiser's findings upon reexamination, file a written request that a *test* be made to determine the percentage clean content of the wool or hair. The appraiser shall then cause a representative quantity of the wool or hair in dispute to be selected and tested by a commercial method approved by the Bureau. The yield, as determined by such commercial *test*, shall be suitably adjusted to coincide with the definition of clean content in article 13.11 (*a*). Such *test* shall be made under the supervision and direction of the appraiser at an establishment approved by him, and the expense thereof, including the actual expense of travel and subsistence of customs officers but not their compensation, shall be paid by the person who requested the *test*.

(*d*) If the appraiser is not satisfied with the results of any *test* provided for in section 13.14 (*e*) or in paragraph (*c*) of this section, he may, within 14 calendar days after receiving the report of the results of such *test*, proceed to have another *test* made upon a suitable sample of the wool or hair at the expense of the Government. When the appraiser is proceeding to have another *test* made, he shall, within the 14-day period provided for in this paragraph, notify the importer of record, owner, or transferee, as the case may be, by mail of that fact. The appraiser shall base his final report of clean content upon a consideration of all the *tests* and *examinations* made in connection with the wool or hair concerned. [Italics added.]

At the trial, defendant conceded that the said regulations were complied with in entering the shipment in question, while counsel for plaintiff stated that "at this time it is not our intention to challenge that method but specifically to determine whether the procedure which was adopted and finally culminated in the liquidation of the entry covered by this protest did follow the regulations as written."

The wool in question was subjected to three tests, i. e., two laboratory and one commercial, the results of which varied according to the percentage of clean content as follows:

First laboratory test_____ 57.00 percent clean content
Second laboratory test_____ 55.40 percent clean content
Commercial test_____ 54.82 percent clean content

The assessment is based upon the result of the second laboratory test, while plaintiff contends the last test should have prevailed. Plaintiff's counsel, in his brief, presents the point as follows:

In addition, the commercial test was the last of three tests, and the result thereof should have been used when liquidating the entry and not the result of the second laboratory test. When the plaintiff applied for a second laboratory test, such action vacated, *ipso facto*, the results of the first laboratory test. In other words, the second laboratory test was in the nature of a protest against, or an appeal from, the results of the first laboratory test. Therefore, the latter was voided by the taking of such an appeal, so-called. Likewise when a request for the commercial test was filed, it vitiated the second laboratory test. The Collector would have been justified in taking the results of the second laboratory test; namely 55.4%, if there had been no commercial test. Consequently, the only yield of clean content which the Collector could have used is 54.60%, the result of the commercial test on the said 172 bales.

It will be observed that while section 13.15, *supra*, is titled, "Examination for clean content by nonlaboratory method," its language clearly indicates that the section has reference primarily to the so-called "commercial test," so that the two sections, 13.14 and 13.15, read together, cover, beyond the slightest doubt, the procedure to be followed in applying tests for determination of clean content. The last sentence of section 13.15 (d) again repeated "The appraiser shall base his final report of clean content upon *a consideration of all the tests and examinations* made in connection with the wool or hair concerned," is clear and definite that its application is not confined to the "Examination" provided for in section 13.15, *supra*, but also contemplates the tests mentioned in section 13.14.

Plaintiff further contends that the regulation prescribing the so-called commercial test is "confiscatory." Such a test is in no sense mandatory, but purely optional. It is conducted only upon request of the party "dissatisfied with the result of the second laboratory test," section 13.14 (e), *supra*. In the present case, plaintiff elected to invoke the provision, permitting a commercial test, after the results of the two earlier laboratory tests were allegedly unsatisfactory. While the commerical test was not applied in accordance with the original request to test the entire shipment of 688 bales—only 25 per centum were actually tested—nevertheless, plaintiff had full knowledge of the procedure acceptable to the customs authorities and "acquiesced" therein before the processing was begun. The statement of plaintiff's witness, Purdy, in consenting to such test is quoted: "I acquiesced on the assurance—which is part of the evidence there—of the customs laboratory that the test of twenty-five per cent would in their opinion be as conclusive as the test of the whole thing."

We find no reason in the record to disturb the fair conclusion that what was done with reference to the third, or commercial, test was with the complete knowledge and consent of the party now com-

plaining therewith. Even if we were willing to consider the proposition in this opinion—despite the fact there is no reason for such discussion—the testimony is not at all sufficient to warrant a finding, whether the procedure followed in conducting the commercial test is or is not confiscatory.

The contention most strongly stressed by plaintiff is that the clean content reported in this case is not a determination by the appraiser but rather the conclusion of the Commissioner of Customs. The basis for such claim lies in an exchange of letters between the two customs officials. The appraiser, after receiving from the Government chemist the findings in the commercial test, wrote to the Commissioner under date of March 7, 1944 (exhibit 8), including therein a statement setting forth the results of the three tests. That letter was followed up with one dated April 7, 1944 (exhibit 9), wherein the appraiser asked "if any decision has been reached by the Bureau as to final clean content to be adopted in reporting upon the clean content of the 688 bales of wool" reported on March 7, 1944 (exhibit 8). In his reply, under date of April 18, 1944 (collective exhibit 1–A), the Commissioner stated "that the result of the second laboratory test, namely, a percentage clean content of 55.4, should be adopted as the finding of clean content in connection with the importation in question."

Of greatest significance and the controlling factors in this phase of the case, are the official report, upon which the collector based his assessment, bearing the appraiser's signature, and a notation on the invoice, indicating the official finding of clean content, which is initialed by the appraiser. There is nothing in the correspondence (exhibits 8, 9, and collective exhibit 1–B), all preliminary to the appraiser's action, to disturb the ultimate conclusion that the report of clean content was made by the customs official designated for that purpose. It is not for the court to inquire into reasons for the appraiser's finding. *Muser* v. *Magone*, 155 U. S. 240.

There is nothing in *Penick & Ford (Ltd., Inc.)* v. *United States*, 12 Ct. Cust. Appls. 432, T. D. 40611, cited by plaintiff, contrary to the views expressed herein. In that case, which arose under the Tariff Act of 1922, the issue concerned proper sampling of blackstrap molasses, in accordance with then-existing customs regulations. The case turned on the weight of the testimony adduced therein from which the court found that the Government sampler "did not take his samples in accordance with either the letter or the spirit of the Treasury regulations pertaining thereto." In the present case, we find that the controlling customs regulations, *supra*, were followed and that in applying them to the shipment in question the customs officials adhered to the several provisions precisely as they are written.

The *Penick & Ford* case, *supra*, has importance herein only as it emphasizes the fundamental principle, which is equally applicable to the present issue "that the reasonable regulations of the Secretary of the Treasury, when he is authorized by statute to establish the same, are entitled to and have the force of law."

In view of the premise upon which the case has been presented, we deem it unnecessary to further discuss the testimony or documentary evidence. We have, nevertheless, examined the entire record in the light of the customs regulations against which complaint is directed, and find nothing in the procedure to justify criticism or to disturb the reasoning hereinabove outlined that leads to the conclusion affirming the collector's action.

The protest is overruled and judgment will be rendered accordingly.