· (C. D. 1365)

FRED WHITAKER COMPANY, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided September 26, 1951)

*Benjamin A. Levett* (*Meyer Ohlbaum* of counsel) for the plaintiff.
*David N. Edelstein*, Assistant Attorney General (*Dorothy C. Bennett* and *Daniel I. Auster*, special attorneys), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges

COLE, Judge: Plaintiff, an importer and processor of wool, entered at the port of Philadelphia a quantity of "Greasy Combing Wool 64's," which was classified under paragraph 1102 (b) of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 1102 (b)), as wool in the grease, not specially provided for, and assessed with duty at 34 cents per pound of clean content.

The collector's classification and rate of duty are not disputed. The issue herein concerns, exclusively, the percentage of clean content. Assessment was based on 51.6 per centum of the returned net weight of the wool. Plaintiff claims 46 per centum as the amount of clean content.

The case was assigned to the writer of this opinion, to hear or to hear and determine while on circuit, by the chief judge, pursuant to authority vested in him under the statute (28 U. S. C., 1946 ed., Supp. III, § 254). My views set forth in *Geo. S. Bush & Co., Inc., et al.* v. *United States*, 22 Cust. Ct. 158, C. D. 1175, questioning the jurisdiction of the division to decide a case somewhat similar to these proceedings, continue as the minority expression from the division.

Under the practice and procedure of the court and the rules applicable thereto, much litigation before the court is dependent upon my participation in a decision of the same. Adhering, however, to my views expressed in the *Bush* case, *supra*, but for the purpose of expediting the work of the court, I am preparing this opinion and participating in the decision and the judgment accompanying the same.

Hearings were had at Boston, New York, and Philadelphia, during which 17 witnesses testified—11 on behalf of plaintiff and 6 for defendant—and numerous documentary exhibits were received. Our review of the record is not an outline of each individual witness' testimony but a summation with particular reference to portions deemed most pertinent to our conclusions.

Dr. Louis Tanner, a chemist in the customs service since 1926 and now employed as chief chemist in the Government's wool laboratory at Boston, in describing the procedures leading to determination of the percentage of clean content of the wool under consideration, and upon which the collector's assessment was based, furnished this interesting introduction to our discussion.

During the period immediately following enactment of the Tariff Act of 1930, and up to 1941, customs examination of wool was made by the so-called "visual method," from hand-drawn samples taken by the examining official and accepted by him as representative of a lot. The "visual method" of testing is an estimate or the judgment of the customs examiner, concluded from a thorough consideration of the grade or quantity of the wool, its origin, past experience of the individual with comparable types, and other details recognized as bearing on the problem. This method of examining wool is followed to some extent today, but, it should be emphasized, such procedure was exclusively followed throughout the operation of the Tariff Act of 1922, when the words "clean content" first appeared in tariff legislation, until 1941, when a coring method of sampling, and laboratory test, developed under the witness' supervision and guidance with cooperation from technical and practical men in the wool industry, were established for use in determining the percentage of clean content of imported wool. The coring method of obtaining samples of wool involves use of a tube (20 inches long and 2 inches in diameter), with a cutting blade at one end and a device for attachment to an electric drill at the other. The tube is inserted at random into the bale, pressed against the wool, and then, by pulling the trigger of the drill, the tube rotates and cuts a core of wool that is retained in the tube. For preservative purposes, the core sample is pushed by means of a rod from the tube into a moistureproof container. The quantity or number of such coring samples withdrawn in any particular sampling operation is based upon a generally recognized scientific method,

designed to obtain a representative selection of the mass. Counsel for plaintiff, in his brief, expresses acceptance of this practice in this way:

With this boring method of obtaining representative samples plaintiff has no quarrel. In fact it is undoubtedly true that some dealers prefer this method of obtaining representative samples, as shown by the testimony of defendant's witnesses Von Bergen and Tully. That a few pounds of wool can be accurately representative of an entire shipment is of course impossible, but that the borings are more nearly representative than the former haphazard method of examining "a fleece or two or more portions of fleeces", drawn according to the sampler's judgment, cannot be gainsaid.

The dispute herein arises from the laboratory procedure followed in determining clean content of this wool. The first step is to scour and oven-dry the wool. After determining the quantity of "scoured dry wool present in the sample," further examination thereof is made for "the quantity of burr and any other impurity which may be present in that scoured wool." There are three known methods for making this computation. The usual one is by chemically dissolving the wool, leaving only the burr and other foreign matter to be weighed. A comparatively long and tedious operation is hand-picking, or using tweezers, to remove the undesirable impurities. The third process is to render the wool transparent, permitting all of the foreign matter to be seen and counted according to size and type, and then calculating the actual quantity, by multiplying the number of particles by the average weight, a standard figure obtained through "a long series of tests on all types of vegetable matter normally encountered in imported wool." The practical effect of the procedure was explained by the witness as follows:

* * * The laboratory method was designed to give a clean content without loss, and it was recognized that if the results of it were to be made comparable *all wool which was lost or damaged, destroyed or rendered short in fiber length* was to be, for the purposes of this test, carefully gathered, and the quantity determined; and that this quantity was to be added to the carbonized yield. So that a suitable comparison could be made between the laboratory method and the carbonized yield, plus wastes found in the actual commercial tests. [Italics added.]

Plaintiff's complaint of this method is based on the premise that such procedure is illegal in that there is included, in determining clean content thereunder, a percentage of fibers that is not wool, either in the commercial or in the tariff sense. Stated differently, plaintiff contends that the statutory words, "clean content," contemplate the commercial yield which makes allowance for certain wastes and irrecoverable loss occurring throughout processes to make available wool that is commercially usable.

To support the position, plaintiff cites a group of cases, holding in effect that the term "wool," for tariff purposes, is restricted to the

commodity having commercial value as wool. *United States* v. *Bennet*, 66 Fed. 299; *United States* v. *Heckman*, 1 Ct. Cust. Appls. 272, T. D. 31318; and *A. C. Lawrence Leather Co.* v. *United States*, 21 Cust. Ct. 122, C. D. 1139.

The *Bennet* case, *supra*, the earliest of the group, involved certain raw Angora goatskins with hair or wool on, and in excluding such merchandise from classification as wool skins, the court said:

* * * It is not profitable to separate the hair from the skins, and to use the hair as wool. They are for all commercial uses undressed fur skins, and while they are also, literally, undressed wool skins, or skins with the wool on, their classification for tariff purposes should not be under the head of "wools," because practically they are not such. While bearing the name of "wool," they are not the wools to which the wool schedule relates, and it is too close an adherence to literalism to classify them as something which they are not.

Under somewhat similar circumstances, the court in the *Heckman* case, *supra*, said:

* * * The skins with the wool on referred to in that paragraph [paragraph 360 of the Tariff Act of 1897, providing for wools on the skin] are skins carrying such a quantity and character of wool as is valuable in itself as wool after being separated from the skin, and which it is profitable to remove from the skin on which it grew. It then becomes capable of entering into competition with domestic wool which the purpose of paragraph 360 is to protect.

The *Lawrence* case, *supra*, cited with approval the two cases just mentioned, and then held:

* * * The controlling principle announced in the *Heckman* case, *supra*, and followed in the other cited cases, is that the "wool" on imported skins is not an all-embracive designation, intended to include under all conditions and in every circumstance the substance commonly known as wool, but is restricted to the commodity that has commercial value in itself as wool. Hence, imported skins with wool which cannot be profitably removed therefrom and is actually drained off and lost in processes, like the wool on the imported skins in question, are not within a tariff classification for wool.

Although the issues in those cases were not identical with that presented herein, their controlling influence lies in the interpretation of the term "wool," as the limitation set forth in the foregoing quotations is to be applied in fixing the clean content of wool in this case. While the words, "clean content," are used in the law itself, for a tariff definition thereof, we must turn to the customs regulations, issued pursuant to statutory authority, paragraph 1104 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 1104). Customs Regulations of 1943 (section 13.11), in effect at the time of the importation in question, define "clean content" as follows:

(1) The words "clean content" shall mean all that portion of the wool or hair which consists exclusively of wool or hair free of all vegetable and other foreign material, containing 12 percent by weight of moisture and 1½ percent by weight of material removable from the wool or hair by extraction with alcohol, and having an ash content not exceeding one-half of 1 percent by weight.

Consistent with the statutory construction in the *Bennet, Heckman,* and *Lawrence* cases, *supra,* the word "Wool," as used in association with the words "clean content" in the above definition, can include only that commodity having "commercial value in itself as wool," and will not extend to embrace fibers either destroyed in processing or not susceptible of commercial use as wool. No such considerations were given by the Government chemist, as he followed the laboratory procedure in determining clean content of the present merchandise. Instead, his calculations included all sorts of fibers, without regard to their commercial usability as wool. In other words, the laboratory technique, as it manipulated the imported merchandise, made no attempt to adhere to the tariff understanding of "wool" as construed in the three cited cases. Hence, the result therefrom is not clean content of "wool," under the cited authorities, but rather the percentage of fibers, irrespective of their practical value or commercial recognition as wool. To accept such a determination would have the effect of applying two different meanings to the tariff term "wool," a construction that certainly would be contrary to congressional intent.

It should be borne in mind that the laboratory method under discussion is a comparatively recent development, introduced by customs officials in 1941, 11 years after enactment of the Tariff Act of 1930. The procedure is not part of the statutory regulations, Customs Regulations of 1943, *supra,* held to be reasonable in *Prouvost Lefebvre of Rhode Island, Inc.* v. *United States,* 16 Cust. Ct. 180, C. D. 1007, and which were concededly complied with herein, but rather a departmental routine invoked by the Government chemist as presumptive compliance with the said regulations. It came about through instructions the witness, Tanner, received from his immediate superior, the chief chemist at New York, and from the Bureau of Customs, to investigate the practicability of expanding the Government's laboratory testing to determine clean content of imported wool. Its purpose has not been accomplished because it failed to adhere, through the individual steps comprising the complete procedure, to the limited scope of "wool," within the cited authorities. Such omission renders the laboratory method illegal and the appraiser's finding of clean content, pursuant thereto, becomes erroneous.

The conclusion leads to consideration of the processing in plaintiff's plant which was explained in detail by Ralph Whitaker, president of the plaintiff corporation, and Jackson Bauer, its chief chemist. Their statements were corroborated by nine additional commercial witnesses. Exception was taken by defendant to the admissibility of this testimony, but we regard it as completely relevant and germane to the general situation with which we are confronted in this new development of litigation involving wool imports. The combined testimony supplies the following facts.

The wool in question, being tightly packed in bales, was first subjected to mechanical treatment to open it up for removal of heavy dirt and sand to prevent clogging of the scouring bowls and contamination of the scouring liquid. Scouring consisted of immersing the wool through a series of bowls or machines, the first of which, containing only water, removed a natural salt deposit known as "suint." Further manipulation carried the wool through scouring bowls, having water at varying degrees of temperature, and using soda ash and soap as scouring agents to break the dirt into small particles and emulsify the grease.

Scouring is merely cleaning so that practically all the burr and vegetable content present in the original wool remained after the scouring process. Most wools are used after scouring and without additional treatment, but the present shipment, being a burry wool (comparatively high in impurities), was further processed, i. e., carbonized and neutralized. These additional processes, as employed herein by plaintiff, are universally followed throughout the wool trade in the treatment of carbonizable or burry-type wools, the class that includes the present merchandise.

Carbonization is a chemical treatment, using sulphuric or muriatic acid. After passing through the acid bowl, the wool was squeezed for removal of surplus acid, reducing the quantity of acid liquor to approximately 38 per centum by weight of the wool. A drying machine evaporated the moisture and then the wool was subjected to baking action, breaking down the burr and vegetable content. Crushing rolls reduced the foreign matter to a black powder or carbon, which was removed as the wool was conveyed through dusting machines that, by a whirling and fanning action, throw out "any loose dirt, dust, or very short fiber."

In the neutralizing process, a coating of acid was removed, and the wool thoroughly washed, cleaned, and dried.

Despite plaintiff's effort to get the highest yield possible out of every lot of wool by returning waste fibers through dusting machines for recovery of as much fiber as is usable, there occurs, through every stage of the processing, some unavoidable loss of fibers. Some are completely lost as a result of the mechanical and chemical processes; others, having no commercial value as wool, are sold to farmers as fertilizer. Plaintiff characterizes the collection, being no part of the commercial yield, as an "unrecoverable loss," and claims that the percentage thereof (5.6 per centum herein) should not be included in determining clean content for assessment of duty.

The percentage of shrinkage from each of plaintiff's processes is not determinable because all three operations—scouring, carbonizing, and neutralizing—are integrated and follow as one continuous proc-

ess to obtain, as described by plaintiff's chemist, "the yield of commerce." Thus, the amount of shrinkage determined by plaintiff is an over-all figure based on the baled weight of the wool. On the present shipment, four tests were conducted, details of which are set forth in the following tabulation:

| NUMBER OF BALES | WEIGHT | SHRINKAGE | CLEAN CONTENT |
|---|---|---|---|
| 14 | 5,301 lbs. | 54. 5% | 45. 5% |
| 14 | 4,294 lbs. | 52. 8% | 47. 2% |
| 36 | 11,259 lbs. | 51. 9% | 48. 1% |
| 50 | 15,538 lbs. | 56. 7% | 43. 3% |

The average commercial yield ("baled yield") from these tests was 46 per centum, which plaintiff claims to be the percentage of clean content for assessment of duty under paragraph 1102 (b), *supra*.

To support that claim, based on the premise that percentage of clean content shall be taken as the commercial yield with allowance for unrecoverable loss including fibers incapable of commercial use as wool, plaintiff introduced a line of proof, not only uncontradicted but also with some corroboration from defendant's witnesses, establishing that "clean content" is not a trade term and not used commercially in any way, that purchases and sales of wool in the grease are based on the estimated commercial yield obtainable from the wool, or, as stated by the witness, Whitaker, "the amount of pounds that will be produced from that wool by the commercial method of cleaning it up," and that such trade practice has been followed over a long period of years, extending back to a time prior to enactment of the Tariff Act of 1922 when the words "clean content" first appeared in tariff legislation.

The record is also conclusive in showing that the visual method of finding clean content was exclusively used by customs officials until the referred to laboratory procedure was invoked in 1941, and that it followed the practice of the wool industry by recognizing clean content as the clean yield of commerce. Further proof of customs recognition of commercial practice is found in early customs regulations, Division of Customs, Circular Letter 612 of September 23, 1922, promulgated shortly after the Tariff Act of 1922 went into effect and later embodied in the Customs Regulations of 1931 (Art. 768), directing appraising officers to follow "commercial methods in determining the clean content of wool."

As shown in the itemization, hereinbefore set out in tabulated form, plaintiff's claim for assessment of 46 per centum of clean content, is based on processing of 114 bales, aggregating 36,392 pounds. Fifty of those bales, showing a clean content of 43.3 per centum, were processed under Government supervision and to the entire satisfaction of customs officials. From a quantitative standpoint, the tests are deemed adequate for plaintiff's purpose, and considered in connection

with the proof herein, establishing that throughout the life of the Tariff Act of 1922 and during the Tariff Act of 1930 until 1941, when the laboratory procedure held herein to be illegal was invoked, clean content of wool had been recognized in commercial practice, as well as by customs officials, to be the commercial yield, the record in its entirety is sufficient to support plaintiff's claim. Accordingly, we hold the wool in question to be dutiable on a percentage of clean content of 46 per centum, under paragraph 1102 (b), *supra*, as wool in the grease, at the rate applied by the collector.

*Gallagher & Ascher* v. *United States*, 14 Ct. Cust. Appls. 38, T. D. 41548, discussed at length in defendant's brief, is not in point. That case related entirely to the force and effect of a circular letter or temporary regulation issued pursuant to statutory authority. The present controversy deals with a procedure that is not a part of customs regulations but rather a laboratory technique developed by customs officials. The distinction is a material one, rendering defendant's theory inapplicable.

Counsel for defendant, in their brief, argue that plaintiff's processing advanced the imported wool to become carbonized wool and, therefore, to sustain plaintiff's claim would be to apply a lower rate of duty on a commodity provided for in the tariff act at a higher one. We think not. The statutory definition of "scoured wools," paragraph 1101 (b) (2) and (3) of the Tariff Act of 1930 (now paragraph 1101 (c) (2) and (3), as amended by the Customs Administrative Act of 1938), provides that they shall be considered as such wools as have been cleansed, other than by washing with water only, on the animal's back or on the skin, but "not including shaking, willowing, burr-picking, or carbonizing." Specific mention of the four processes as exceptions that will not remove wool from the scoured state reveals a congressional intent to regard those operations as necessary to obtain the clean content of scoured wool. Applying the reasoning to wool in the grease, the present merchandise, it can be said that subjecting such wool after it has been washed and scoured to any of the four named processes will result in the clean content of the product. Counsel for plaintiff, in his brief, presents the point in this way:

It is clear, therefore, in view of these added words to the definition of scoured wool, that Congress now understood that scoured wool contained impurities that are eliminated by shaking, willowing, burr-picking or *carbonizing*. From this it would appear manifest that the rate of duty on the clean content of scoured wools is to be based upon the weight of such wools *after* shaking, willowing, burr-picking *and/or* carbonization. We therefore may consider it as a safe proposition that when passing the present act, Congress not only ordained that all *scoured* wool be assessed on the basis of clean content, as well as all wool in the grease, but also now understood that that clean content was not in *all* cases the full weight of the scoured wool, but was, as to burry wools, the weight of the scoured wool

*less the impurities and unrecoverable fibres that might be removed by the four processes mentioned.* [Italics quoted.]

Other phases are discussed in defendant's brief. All have been given careful consideration but require no further comment as none disturbs our conclusion which is controlled by the *Bennet, Heckman,* and *Lawrence,* cases, *supra,* as they construed the term "wool."

The protest is sustained and judgment will be rendered accordingly.